**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUSTAVO CAMILO, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>        v.<br><br>LYFT INC., ENDOR CAR & DRIVER, LLC, TRI-CITY, LLC and TRI-STATE CAR AND DRIVER, LLC, THE BLACK CAR FUND, BLACK CAR ASSISTANCE CORPORATION, and NEW YORK BLACK CAR OPERATORS INJURY COMPENSATION FUND, INC.,<br><br>               Defendants. | **Case No. 1:17-cv-9116-ALC** |

<u>**LYFT DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION**</u>

MAYER BROWN LLP

Archis A. Parasharami
Daniel E. Jones (*pro hac vice* to be filed)
1999 K Street, N.W.
Washington, DC 20006-1001
Tel.: (202) 263-3000
aparasharami@mayerbrown.com

*Counsel for Defendants Lyft, Inc.; Endor Car & Driver, LLC; Tri-City, LLC; and Tri-State Car and Driver, LLC*

June 11, 2018

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    A.    Mr. Camilo Agrees To Arbitrate His Disputes With The Lyft Defendants
            On An Individual Basis ............................................................................. 2

    B.    The Features Of Mr. Camilo's Arbitration Agreement. ........................... 5

    C.    Mr. Camilo Sues Lyft Notwithstanding His Arbitration Agreement .................... 6

ARGUMENT ....................................................................................................... 7

I.    THE FAA REQUIRES THE ENFORCEMENT OF MR. CAMILO'S
    ARBITRATION AGREEMENT. ................................................................... 7

    A.    Mr. Camilo Entered Into A Valid Arbitration Agreement ...................... 8

    B.    Lyft's Arbitration Provision Is Enforceable Under Federal Law. ....................... 11

    C.    Mr. Camilo's Claims Are Within The Scope Of His Arbitration
            Agreement. ............................................................................................... 12

II.    THE CLAIMS AGAINST THE LYFT DEFENDANTS SHOULD BE STAYED
    PENDING ARBITRATION. ........................................................................ 14

CONCLUSION .................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017)...................................................................10

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)..........................................................................8, 11, 12

*AT&T Techs., Inc. v. Comm'ns Workers of Am.*,
    475 U.S. 643 (1986).....................................................................................13

*Bekele v. Lyft, Inc.*,
    199 F. Supp. 3d 284 (D. Mass. 2016) ..........................................................11

*Camilo v. Uber Techs., Inc.*,
    2018 WL 2464507 (S.D.N.Y. May 31, 2018) .................................................2, 12

*Collins & Aikman Prods. Co. v. Bld. Sys., Inc.*,
    58 F.3d 16 (2d Cir. 1995)..............................................................................13

*In re D.R. Horton, Inc.*,
    357 N.L.R.B. 2277 (2012) ...........................................................................1, 11

*Damato v. Time Warner Cable, Inc.*,
    2013 WL 3968765 (E.D.N.Y. July 31, 2013) ..................................................12

*Dean Witter Reynolds Inc. v. Byrd*,
    470 U.S. 213 (1985)......................................................................................12

*DIRECTV, Inc. v. Imburgia*,
    136 S. Ct. 463 (2015)....................................................................................12

*Epic Systems Corp. v. Lewis*,
    --- S. Ct. ----, 2018 WL 2292444 (May 21, 2018) .........................................1, 11

*Exp. Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*,
    715 N.E.2d 1050 (N.Y. 1990).........................................................................9

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995).....................................................................................8, 13

*Frankel v. Citicorp. Ins. Servs., Inc.*,
    2015 WL 6021534 (E.D.N.Y. Oct. 14, 2015)...................................................12

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)........................................................................10

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)........................................................................14

*Kai Peng v. Uber Techs., Inc.*,
237 F. Supp. 3d 36 (E.D.N.Y. 2017) ........................................................................12

*Katz v. Cellco P'Ship*,
794 F.3d 341 (2d Cir. 2015)........................................................................14

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
137 S. Ct. 1421 (2017)........................................................................8

*KPMG LLP v. Cocchi*,
565 U.S. 18 (2011)........................................................................12

*Loewen v. Lyft, Inc.*,
129 F. Supp. 3d 945 (N.D. Cal. 2015)........................................................................11

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)........................................................................8, 9, 10

*Moore v. Microsoft Corp.*,
293 A.D. 2d 587 (N.Y. App. Div. 2002)........................................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)........................................................................8, 13

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)........................................................................9

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)........................................................................9

*Starke v. Gilt Groupe, Inc.*,
2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014)........................................................................10

*United States v. Barlow*,
568 F.3d 215 (5th Cir. 2009)........................................................................7

*United States v. Konn*,
634 F. App'x 818 (2d Cir. 2015)........................................................................7

**Page(s)**

*Zaltz v. JDATE,*
    952 F. Supp. 2d 439 (E.D.N.Y. 2013) ....................................................................................10

**Statutes**

9 U.S.C. § 2.......................................................................................................................7, 8

9 U.S.C. § 3..........................................................................................................................14

N.Y. Labor Law § 193 ...........................................................................................................7

**INTRODUCTION**

In responding to defendants' pre-motion conference letter, plaintiff Gustavo Camilo did not deny that he agreed to Lyft's September 30, 2016 Terms of Service Agreement, including its arbitration provision. Indeed, he relies on that agreement in alleging a breach of contract claim against Lyft and the other Lyft defendants, which are wholly-owned subsidiaries of Lyft. Lyft denies that Mr. Camilo's claims have merit, but that question is for an arbitrator to decide. The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") requires Mr. Camilo to honor his agreement to resolve his disputes with Lyft and its "subsidiaries" through binding arbitration on an individual basis.

Mr. Camilo previously indicated that he would seek to resist Lyft's motion to compel arbitration primarily by relying on the National Labor Relations Board's 2012 ruling that the National Labor Relations Act renders class or collective action waivers in arbitration agreements unenforceable in certain contexts. *See In re D.R. Horton, Inc.*, 357 N.L.R.B. 2277 (2012); Dkt. No. 19, at 1-2; Am. Compl. ¶¶ 125-128. But the U.S. Supreme Court has now squarely rejected the NLRB's position and reaffirmed that individualized, informal proceedings are the touchstone of arbitration as envisioned by the FAA. *See Epic Systems Corp. v. Lewis*, --- S. Ct. ----, 2018 WL 2292444 (May 21, 2018). As the Supreme Court held, the FAA requires courts "to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Id.* at \*3. And the National Labor Relations Act does not contain a "conflicting command"; the NLRA "says nothing about how courts and arbitrators must try legal disputes" and therefore does not "permit[] this Court to declare the parties' agreement[] unlawful." *Id.* It should thus come as no surprise that Judge Hellerstein recently enforced Mr. Camilo's arbitration agreement with Uber in a parallel case, noting that *Epic Systems* made clear that "the class action

1

waiver" in Mr. Camilo's arbitration agreement "is valid and enforceable." *Camilo v. Uber Techs., Inc.*, 2018 WL 2464507, at *3 (S.D.N.Y. May 31, 2018). The same result is warranted here.

Mr. Camilo also has no other basis to avoid enforcement of his agreement to arbitrate. Lyft's method of contract formation is fully enforceable; the arbitration provision provides Mr. Camilo a cost-effective and fair method for resolving his disputes; and the broad scope of the arbitration provision easily encompasses his claims.

For these reasons, the Court should compel Mr. Camilo to arbitrate his claims against the Lyft defendants on an individual basis and stay the litigation against the Lyft defendants pending the resolution of arbitration.

## BACKGROUND

### A.    Mr. Camilo Agrees To Arbitrate His Disputes With The Lyft Defendants On An Individual Basis.

Defendant Lyft, Inc. operates a mobile-based ridesharing platform (the "Lyft Platform") that enables people who seek transportation to certain destinations ("riders") to be matched with people willing to drive to or through those destinations ("drivers"). Decl. of Nikolas Laufer-Edel ¶ 3. The Lyft Platform includes, among other things, Lyft's website, technology platform, and mobile phone application (the "Lyft App"). *Id.* Using the Lyft App, Lyft offers information and a method to connect drivers and riders with each other and permit communication between drivers and riders. *Id.* The other Lyft defendants, Endor Car & Driver, LLC; Tri-City, LLC; and Tri-State Car and Driver, LLC are wholly-owned subsidiaries of Lyft that were created for the purpose of providing coverage under the New York Black Car Fund. Am. Compl. ¶¶ 6, 41.

Lyft's Terms of Service Agreement describes the terms and conditions on which Lyft offers both riders and drivers (collectively, "users") access to the Lyft Platform. Laufer-Edel

Decl. ¶ 5. Users consent to Lyft's Terms of Service Agreement as part of the registration process (*id.*), as well as on certain occasions after Lyft updates its Terms of Service Agreement (*id.* ¶¶ 6-9).

According to Lyft's records, Mr. Camilo first agreed to Lyft's Terms of Service on March 18, 2015. Laufer-Edel Decl. ¶ 13 & Ex. 2. Most relevant here, however, Lyft's records show that, on November 17, 2016, Mr. Camilo also agreed to Lyft's September 30, 2016 version of its Terms of Service Agreement (*id.* Ex. 2). Specifically, subsequent to Lyft updating its terms effective September 30, 2016, registered Lyft users who opened the Lyft App were required to indicate their acceptance of the updated Terms of Service Agreement, which automatically appeared on a screen in the App. *Id.* ¶ 7. Once presented with the screen, users could scroll all the way through the text of the entire September 30, 2016 Terms of Service Agreement. *Id.* ¶ 8.

The top of the screen informed users that "Before you can proceed you must read & accept the latest Terms of Service." *Id.* ¶ 7. And at the bottom of the screen is a button with the words "I accept." *Id.* Drivers presented with this screen were required to click the "I accept" button in order to proceed to offer a ride through the Lyft App. *Id.* ¶ 9. And once a driver previously registered on the Lyft Platform, like Mr. Camilo, was presented with the screen, it would continue to appear each time the driver opened the Lyft App until the driver clicked the "I accept" button. *Id.* Lyft automatically recorded the date and time when a user clicked the "I accept" button; according to Lyft's records, Mr. Camilo clicked the "I accept" button on November 17, 2016. *Id.* ¶¶ 11, 13 & Ex. 2.

In the second full paragraph, the September 30, 2016 Terms of Service Agreement alerts users to the arbitration agreement, stating "PLEASE BE ADVISED: THIS AGREEMENT

CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS YOU AND LYFT HAVE AGAINST EACH OTHER CAN BE BROUGHT (SEE SECTION 17 BELOW)," and further specifying that the Terms will "REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING." *Id.* ¶ 7 & Ex. 1, at 1. The same paragraph also alerts drivers like Mr. Camilo to their "OPPORTUNITY TO OPT OUT OF ARBITRATION." *Id.*

The arbitration agreement itself requires Mr. Camilo to resolve "ALL DISPUTES AND CLAIMS BETWEEN US" through binding arbitration on an individual basis, with "US" defined to include "our affiliates, subsidiaries, parents, successors and assigns." Laufer-Edel Decl. Ex. 1 § 17(a). The agreement expressly includes claims "arising out of or relating to:" "this Agreement and prior versions thereof," "the Lyft Platform," "your relationship with Lyft," or "payments made by you or any payments made or allegedly owed to you." *Id.* The agreement also expressly includes claims under "state or federal wage-hour law," claims for "breach of any express or implied contract," and "all other federal and state statutory and common law claims." *Id.*[1] And the arbitration agreement specifies that "YOU AND LYFT MAY EACH BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT ON A CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE BASIS." *Id.* § 17(b).

---

[1] The arbitration agreement's limited enumerated exceptions are for "small claims actions brought on an individual basis"; representative actions brought under "private attorneys general acts" only "to the extent that the representative PAGA Waiver in Section 17(c) of such action is deemed unenforceable by a court of competent jurisdiction"; claims for "workers' compensation, state disability insurance and unemployment insurance benefits"; and "claims that may not be subject to arbitration as a matter of law." Laufer-Edel Decl. Ex. 1 § 17(g).

Mr. Camilo's arbitration agreement also informed him, under the bolded heading "**Opting Out of Arbitration for Driver Claims That Are Not In a Pending Settlement Action**," that he could opt out of the requirement to arbitrate Driver Claims by email or mail "within 30 days of the date this Agreement is executed by you." Laufer-Edel Decl. Ex. 1 § 17(j).[2] Mr. Camilo did not opt out of arbitration (and he has not contended otherwise).

## B. The Features Of Mr. Camilo's Arbitration Agreement.

The arbitration provision in the Lyft Terms of Service Agreement includes several features that ensure that users of the Lyft Platform (including riders and drivers) have a simple and efficient means of resolving any disputes:

- **Low-cost arbitration**: For claims up to $5,000, the user's fees are "limited to $50" if the user chooses to attempt to negotiate the dispute informally with Lyft prior to filing an arbitration demand, unless the arbitrator determines the user's claim "is frivolous or has been brought for an improper purpose (as measured by the standards of Federal Rule of Civil Procedure 11(b))";[3]

- **Potential $1,000 minimum award**: If the user participates in Lyft's optional pre-arbitration negotiation process and the arbitrator issues an award in favor of a user that is greater than "Lyft's last written settlement offer," then Lyft will pay the user $1,000 rather than any smaller arbitral award;

---

[2] The agreement defines "Driver Claims" as claims that:

(A) are based on an alleged employment relationship between Lyft and a Driver; (B) arise out of, or relate to, Lyft's actual deactivation of a Driver's User account or a threat by Lyft to deactivate a Driver's User account; (C) arise out of, or relate to, Lyft's actual termination of a Driver's Agreement with Lyft under the termination provisions of this Agreement, or a threat by Lyft to terminate a Driver's Agreement; or (D) arise out of, or relate to, Fares (as defined in this Agreement, including Lyft's commission on the Fares), tips, or average hourly guarantees owed by Lyft to Drivers for Services, other than disputes relating to referral bonuses, other Lyft promotions, or consumer-type disputes.

Laufer-Edel Decl. Ex. 1 § 17(e)(3).

[3] Even if an arbitrator concludes that a user's claim is frivolous (or the user's claim exceeds $5,000 or the user does not participate in the pre-arbitration negotiation process), the AAA's consumer arbitration rules would cap the amount of costs that the user would have to pay at $200. *See* Decl. of Daniel Jones Ex. 1 at 33 (AAA Consumer Arbitration Rules).

- **Small claims court option**:  Either party may bring a claim in small claims court as an alternative to arbitration;

- **Flexible consumer procedures**:  Arbitration will be conducted under the AAA's Consumer Arbitration Rules;

- **Choice of in-person, telephonic, or no hearing**:  For claims of $10,000 or less, the user has the exclusive right to choose whether the arbitrator will conduct an in-person hearing, a telephonic hearing, or a desk arbitration in which "the arbitration will be conducted solely on the basis of documents submitted to the arbitrator";

- **Conveniently located hearing**:  Arbitration will take place will take place "in the county in which the Driver provides Services" (or, for riders, in the county of the rider's billing address);

- **Lyft disclaims right to seek attorneys' fees**:  "Although under some laws Lyft may have a right to an award of attorneys' fees and non-filing fee expenses if it prevails in an arbitration, Lyft agrees that it will not seek such an award";

- **No confidentiality requirement**:  Either party may publicly disclose the existence of the arbitration and the result; and

- **Full individual remedies available**:  The arbitrator can award any form of relief on an individualized basis (including statutory and punitive damages, attorneys' fees, and injunctions that would affect the claimant alone) that a court could award.

*See* Laufer-Edel Decl. Ex. 1 § 17(d)-(f).

### C.    Mr. Camilo Sues Lyft Notwithstanding His Arbitration Agreement.

Mr. Camilo filed this putative class action in New York state court on October 17, 2017, and Lyft timely removed the case to this Court under the Class Action Fairness Act.  Dkt. No. 1; *see also* Dkt. No. 34 (order denying Mr. Camilo's motion to remand).  In the operative amended complaint, Mr. Camilo alleges that, beginning in January 2014, Lyft improperly required drivers who use the Lyft Platform to pay a fee of 2.5% of each fare for which a payment was made into the New York Black Car Fund.  Am. Compl. ¶¶ 6-9, 12-14.  Mr. Camilo alleges that Lyft was required to collect the 2.5% fee from riders alone, but instead charged the same 2.5% fee to both drivers and riders.  *Id.* ¶¶ 12-13.  Mr. Camilo also alleges that Lyft improperly calculates its commissions on rides given by drivers on its platform based on an amount that includes an

"11.4% administration charge which was for operational expenses and the black car fund." *Id.* ¶ 53; *see also, e.g., id.* ¶ 14.

Relying on those allegations, Mr. Camilo asserts two causes of action against Lyft and the other Lyft defendants: (1) a violation of a violation of New York Labor Law § 193 for unlawful wage deductions; and (2) a claim for a breach of contract of Lyft's Terms of Service, fraud, and unjust enrichment (all lumped together). Am. Compl. ¶¶ 61-134. And he seeks to represent a putative nationwide class. *Id.* ¶¶ 1, 56.

**ARGUMENT**

**I. THE FAA REQUIRES THE ENFORCEMENT OF MR. CAMILO'S ARBITRATION AGREEMENT.**

Mr. Camilo's claims against the Lyft defendants must be arbitrated in accordance with his arbitration agreement, which is contained in the Terms of Service Agreement on which Mr. Camilo relies in alleging a breach of contract claim against Lyft. The FAA governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here: (i) Mr. Camilo's arbitration provision is in writing (*see* pages 2-5, *supra*); and (ii) contracts governing the use of an Internet-based application plainly involve interstate commerce, because "there can be no question that the Internet is a channel and instrumentality of interstate commerce." *United States v. Konn*, 634 F. App'x 818, 821 (2d Cir. 2015); *see also, e.g., United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) ("[I]t is beyond debate that the Internet and email are facilities or means of interstate commerce."). Moreover, Mr. Camilo's arbitration provision specifies that the provision "is governed by the Federal Arbitration Act." Laufer-Edel Decl. Ex. 1 § 17(a).

Under the FAA, Mr. Camilo's arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." 9 U.S.C. § 2. As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). And this "'liberal federal policy favoring arbitration agreements'" applies "'notwithstanding any state substantive or procedural policies to the contrary.'" *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Here, no grounds "exist at law or in equity for the revocation of" (9 U.S.C. § 2) Mr. Camilo's arbitration agreement. He validly accepted that agreement, its terms are enforceable as a matter of federal law, and it covers the claims that he asserts in this lawsuit.

### A. Mr. Camilo Entered Into A Valid Arbitration Agreement.

Mr. Camilo entered into a binding agreement to arbitrate his disputes with Lyft. This analysis is governed by "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017). As the Supreme Court has underscored, however, states may not make arbitration agreements more difficult to create or enforce than other kinds of contracts: the FAA's mandate that courts "place arbitration agreements on equal footing with all other contracts" applies not only to "the 'enforce[ment]' of arbitration agreements, but also . . . their initial 'valid[ity]'—that is, . . . what it takes to enter into them." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1424, 1428 (2017) (quotation marks omitted).

To begin with, Mr. Camilo's own complaint concedes that he agreed to Lyft's Terms of Service. He brings a breach of contract claim based on that agreement, alleging that "Drivers were bound by contract with Defendants." Am. Compl. ¶ 81; *see also id.* ¶ 90 (relying on "the

Agreements in force from September 2016"); *id.* ¶¶ 119-120 (acknowledging the "arbitration agreement" in Lyft's Terms of Service).  Mr. Camilo therefore cannot deny that he assented to the arbitration provision in the very contract under which he brings his claims.

In all events, as detailed above, Mr. Camilo agreed to the Lyft Terms of Service Agreement by pressing the "I accept" button in the Lyft App.  *See* pages 2-5, *supra*.  The Second Circuit has made clear that the rules of contract formation are no different when a customer engages in a transaction on an electronic device or the Internet, explaining over a decade ago that "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004); *accord Meyer*, 868 F.3d at 74-80 (finding arbitration agreement was formed by completing sign up process on a smartphone).

Whether on paper or on a screen, courts require "reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms."  *Meyer*, 868 F.3d at 75 (alteration and quotation marks omitted).[4]  Lyft's contract formation process here readily complies with these requirements.

Mr. Camilo was presented with the ***full text*** of the Lyft Terms of Service—including the arbitration provision—through the Lyft App.  *See* page 3, *supra*.  He was given the opportunity to scroll through the entire text of the Terms of Service, and he was then required to click a button stating "I accept" to continue offering rides using the Lyft App.  Laufer-Edel Decl. ¶¶ 8-9. Lyft's business records confirm that Mr. Camilo clicked "I accept" on November 17, 2016 after

---

[4]     The Second Circuit in *Meyer* was applying California law, but noted that "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'"  868 F.3d at 74 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)); *see also, e.g.*, *Exp. Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1990).

the Lyft App displayed the September 30, 2016 version of the Terms of Service Agreement to him, and that he continued to use the Lyft App after November 17, 2016. *Id.* ¶¶ 10-14 & Ex. 2.

Well-established precedents on the formation of online or electronic contracts confirm the validity of Mr. Camilo's assent. As the Second Circuit recently explained, "[c]ourts routinely uphold" agreements "which require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer*, 868 F.3d at 75 (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (collecting cases)). One New York court has held in an analogous context that a contract was formed when "[t]he terms of the [agreement] were prominently displayed on the program user's computer screen before the software could be installed," and "the program's user was required to indicate assent to the [agreement] by clicking on the 'I agree' button before proceeding with the download." *Moore v. Microsoft Corp.*, 293 A.D. 2d 587, 587 (N.Y. App. Div. 2002). As the Second Circuit just put it, "Courts around the country have recognized that an electronic 'click' can suffice to signify the acceptance of a contract." *Meyer*, 868 F.3d at 75 (quotation marks and alterations omitted).[5]

Indeed, even prior to *Meyer*, Judge Koeltl compelled arbitration under the same formation process for the September 2016 Lyft Terms of Service Agreement, noting that "the plaintiff assented to the terms of the September 30, 2016 Terms of Service when he clicked 'I accept.'" *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 469 (S.D.N.Y. 2017). And courts have enforced the arbitration provision in earlier versions of Lyft's Terms of Service as well. *See id.*

---

[5]     Indeed, Mr. Camilo's manifestation of assent is even more straightforward than in cases like *Meyer* or *Fteja*. In *Meyer* and *Fteja*, the plaintiffs were presented with a hyperlink to the terms and conditions of service alone rather than, as here, being presented with the full text of the terms. Those courts—and several others—have held that the fact "[t]hat the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice." *Meyer*, 868 F.3d at 78 (citing *Fteja*, 841 F. Supp. 2d 839); *see also, e.g.*, *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 452-54 (E.D.N.Y. 2013).

(citing, *inter alia*, *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 288, 290 (D. Mass. 2016); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 948-49 (N.D. Cal. 2015)).

**B.    Lyft's Arbitration Provision Is Enforceable Under Federal Law.**

Under the FAA, Lyft's arbitration provision is fully enforceable as a matter of federal law.  In his complaint and response to Lyft's pre-motion letter, Mr. Camilo indicated that he planned to challenge the fact that Lyft's arbitration provision (like many other arbitration agreements) requires individual arbitration instead of class or collective actions, relying on the National Labor Relations Board's *D.R. Horton* decision and court decisions that had accepted the NLRB's position.  *See* Am. Compl. ¶¶ 125-128; Dkt. No. 19, at 1-2.

But the Supreme Court's recent opinion in *Epic Systems* definitively forecloses that challenge.  As the Court made clear, the FAA "protect[s] pretty absolutely" the enforceability of agreements to arbitrate under "individualized rather than class or collective action procedures." 2018 WL 2292444, at *6.   And the FAA requires rejecting the "argument that a contract is unenforceable *just because it requires bilateral arbitration*," because "a defense of that kind . . . is one that impermissibly disfavors arbitration" by "seek[ing] to interfere with one of arbitration's fundamental attributes"—namely, its "traditionally individualized and informal nature." *Id.* at *7-8.  The Court further held that the National Labor Relations Act, which "does not mention" either arbitration or "class or collective action procedures," lacks the "clear and manifest" congressional intent required to displace the FAA's rule requiring the enforcement of arbitration agreements according to their terms.  *Id.* at *9-14, *17.

Any attempt to raise a similar challenge under New York law would be futile as well. The law was already clear under *Concepcion*, which held that any state-law rule "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA."  *Concepcion*, 563 U.S. at 344.  "States," the

Supreme Court added, "cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons," such as the goal of ensuring that "small-dollar claims" do not "slip through the legal system." *Id.* at 351; *see also DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015) ("The Federal Arbitration Act is a law of the United States, and *Concepcion* is an authoritative interpretation of that Act. Consequently, the judges of every State must follow it."). Courts in this district have followed *Concepcion* and other U.S. Supreme Court precedents, as they must, in rejecting such challenges. *See, e.g.*, *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 58-59 (E.D.N.Y. 2017); *Frankel v. Citicorp. Ins. Servs., Inc.*, 2015 WL 6021534, at *2-4 (E.D.N.Y. Oct. 14, 2015); *Damato v. Time Warner Cable, Inc.*, 2013 WL 3968765, at *9-13 (E.D.N.Y. July 31, 2013).[6]

### C. Mr. Camilo's Claims Are Within The Scope Of His Arbitration Agreement.

Mr. Camilo's dispute over Lyft's fee and surcharge calculations falls well within the scope of his arbitration agreement. To begin with, the plain language of the agreement requires arbitration of "ALL DISPUTES AND CLAIMS BETWEEN US," including disputes "arising out of or relating to": Lyft's Terms of Service, "the Lyft Platform," "your relationship with Lyft," or "payments made by you or any payments made or allegedly owed to you." Laufer-Edel Decl. Ex. 1 § 17(a). The agreement also expressly includes claims under "state or federal wage-hour law," claims for "breach of any express or implied contract," and "all other federal and state

---

[6]    Mr. Camilo has also suggested that he intends to oppose Lyft's motion because Mr. Camilo did not "enter into any agreements to arbitrate with the Black Car [Fund defendants]." Dkt. No. 19, at 2-3. But that fact has no bearing on Mr. Camilo's obligation to arbitrate his claims against the **Lyft defendants**. The Supreme Court has made clear that the FAA "require[s] that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation." *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) (per curiam) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)). In any event, such piecemeal litigation is unlikely: Judge Hellerstein has explained convincingly in a parallel case why Mr. Camilo's claims against the Black Car Fund defendants should be dismissed on the merits. *Camilo*, 2018 WL 2464507, at *4.

statutory and common law claims." *Id.* The Second Circuit has explained that a narrower clause—one that just covered claims "'arising out of or relating to'" the underlying contract containing the arbitration agreement—would be "the paradigm of a broad clause." *Collins & Aikman Prods. Co. v. Bld. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). Mr. Camilo's agreement with Lyft is even broader than that paradigmatically broad clause. And, because Mr. Camilo is asserting a breach of contract claim against the Lyft defendants, he cannot plausibly contend that his claims somehow fall outside the broad scope of the relevant contract's arbitration provision.

Moreover, it is clear that Mr. Camilo's arbitration agreement covers his dispute with both Lyft and the other Lyft defendants. The agreement requires arbitration of all claims "between you and Lyft, including our affiliates, **subsidiaries**, parents, successors and assigns." Laufer-Edel Decl. Ex. 1 § 17(a) (emphasis added). As the complaint acknowledges, the other Lyft defendants are entities "created" by Lyft and are "wholly owned domestic subsidiaries of Lyft." Am. Compl. ¶¶ 6, 41. And it is telling that Mr. Camilo asserts his breach of contract claim against Lyft and the other Lyft defendants alike. *See id.* ¶¶ 76-92, 132-134. Accordingly, the other Lyft defendants are Lyft's "subsidiaries" and entitled to invoke the arbitration clause.

Last, even if there were any uncertainty as to whether Mr. Camilo's claims are arbitrable—and there is none—the Supreme Court has held that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *accord, e.g.*, *First Options*, 514 U.S. at 945 (same); *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

## II.  THE CLAIMS AGAINST THE LYFT DEFENDANTS SHOULD BE STAYED PENDING ARBITRATION.

When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims against some defendants, Section 3 of the FAA directs the district court to compel arbitration and stay the proceedings against those defendants.  *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see also*, *e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Katz v. Cellco P'Ship*, 794 F.3d 341, 343 (2d Cir. 2015).

## CONCLUSION

The Court should compel arbitration of Mr. Camilo's claims against the Lyft defendants and stay the litigation of those claims pending the resolution of that arbitration.


Respectfully submitted.


Dated: June 11, 2018                   MAYER BROWN LLP

                                       By:  /s/ Archis A. Parasharami
                                            Archis A. Parasharami
                                            Daniel E. Jones (*pro hac vice* to be filed)
                                            1999 K Street, N.W.
                                            Washington, DC 20006
                                            Tel.: (202) 263-3000

                                            *Counsel for Defendants Lyft, Inc.; Endor Car & Driver, LLC; Tri-City, LLC; and Tri-State Car and Driver, LLC*